**AETNA CASUALTY and SURETY COMPANY, Appellant,**

v.

**John F. CUNNINGHAM, Appellee.**

**No. 15334.**

United States Court of Appeals
Fifth Circuit.

July 15, 1955.

Rehearing Denied Aug. 12, 1955.

Harvey L. Hardy and Carl Wright Johnson, San Antonio, Tex., Elmer W. Beasley, Hartford, Conn., of counsel, for appellant.

Leonard Brown, San Antonio, Tex., for appellee.

Before RIVES, Circuit Judge, and DAWKINS and DE VANE, District Judges.

RIVES, Circuit Judge.

Appellant, Aetna, sued appellee, Cunningham, for $32,000.00 and interest thereon from December 23, 1949, at which time Aetna issued its draft in that amount to San Antonio Independent School District to make good the failure of Cunningham to complete a building contract, on the performance bond for which Aetna had become his surety. The complaint presented two separate claims of the right to recover the same amount: First, that Cunningham had induced Aetna to execute said bond for his benefit by making to Aetna a materially false statement in writing respecting his financial condition; and, second, that in the application for the bond, Cunningham agreed to indemnify Aetna for all losses sustained by it in consequence of its suretyship. At the outset of the trial, the second claim based on the indemnity contract was conceded, and the issue litigated was the first claim, that is whether Cunningham was guilty of fraud in inducing Aetna to become his surety. The district court found Cunningham liable under the indemnity agreement but not guilty of fraud, its findings of fact and conclusions of law being copied in the margin.[1]

---

1. "Findings of Fact.
"1. Plaintiff executed a surety bond for defendant on July 13, 1949, covering the Sidney Lanier High School Gymnasium construction job, in response to application made on same date by defendant to plaintiff for said bond.
"2. As a necessary prerequisite for obtaining said bond, defendant on March 15, 1949, furnished plaintiff a signed sworn financial statement, made as of December 31, 1948, on a form furnished by plaintiff. In said financial statement defendant submitted among other items of information, figures indicating that he had note liabilities totaling only $30,775.-00, exclusive of the mortgage on his homestead.
"3. The bond was executed by plaintiff in reliance upon the representations contained in the financial statement submitted by defendant, and in reliance upon the contractual obligations therein undertaken.
"4. That on December 23, 1949, plaintiff sustained a loss in the amount of $32,-000.00 as a result of the bond executed by them in behalf of defendant.
"5. That an audit of the books of defendant, made in July, 1950, as of De-

At the outset there is some doubt as to whether Aetna can appeal from the judgment which was in its favor in the amount prayed. If the relief granted was all to which Aetna was entitled, the mere fact that it was granted on one ground rather than on another would not make Aetna an aggrieved party on appeal. See 4 C.J.S., Appeal & Error, § 183, p. 360. But amount is not the sole measure of the relief to which a party may be entitled. The judgment may have different qualities and legal consequences dependent on the claim on which it is based. At the beginning of the trial, Aetna's counsel, in response to an inquiry from the court, frankly stated his reason for insisting on the tort claim for fraud and deceit, "Because if we get a straight contract judgment it would be dischargeable in bankruptcy * * *."

It would be premature for us to pass upon the effect of bankruptcy on a judgment on either claim,[2] or upon whether the finding that Cunningham's representations were not fraudulent would be res judicata as to the operation of a discharge in bankruptcy.[3] It is enough at this time for us to hold that, if Aetna was denied judgment of the quality to which it laid claim, it is a party aggrieved on appeal.

Nor can we agree with Cunningham's counsel that at this time the question is entirely moot, because Cunningham may never file a petition in bankruptcy, or may never be adjudicated a bankrupt. It would be a dangerous doctrine to deny a plaintiff the right to present such issues before bankruptcy, or a discharge therefrom, because by that time evidence may be lost, witnesses may have died or moved away, or various new defensive claims may have arisen, such as waiver of the tort and election to stand on the contract, the statute of limitations, etc. So long as the judgment remains unpaid, the question cannot be said to be moot.

While judgment on either claim would be in the same amount, and payment of the judgment would bar both claims, the two claims in their origin are separate and distinct, the one resting on fraud in inducing Aetna to become Cunningham's surety, and the other being on a separate contract of indemnity. This Court has held that the holder of a note evidencing a loan secured by false representations as to the value of stock offered as security could proceed on the note and at the same time seek to enforce his cause of action for deceit, that, "They are in no sense inconsistent remedies." Zimmern v. Blount, 5 Cir., 238 F. 740, 745. Even if inconsistent, Rule 8(e) (2), Fed.Rules Civ.Proc. 28 U.S.C.A. now provides: "* * * A party may also state as many separate claims * * as he has regardless of consistency * * *." The law is fashioned to work substantial justice in real transactions. We hold, therefore, that when, as a practical matter, the denial of any one claim

---

cember 31, 1948, showed, among other facts that defendant as of that date had note liabilities totaling $223,875.00, that this item represented notes which the defendant executed for interim financing of construction contracts, the defendant borrowing money from the National Bank of Commerce to finance such construction, and paying back these loans as construction proceeded, and that the entire amount of such notes was more than offset by notes, obligations and liens of the persons, firms, and, corporations with whom said construction contracts had been made with the defendant.

"6. That the books of defendant, and of his lumber and construction company, together with the estimates made by his auditor as to the sums invested by him in jobs in progress, and his estimated earnings and retainages all as of December 31, 1948, reconcile substantially all of the figures contained in the financial statement of March 15, 1949, with the exception of the note liabilities.

"Conclusions of Law.

"1. Defendant is legally liable to plaintiff for the loss sustained by the latter under the indemnity provisions of the bond contract.

"2. Defendant's representations contained in his financial statement were not fraudulent.

"Let Judgment be entered accordingly."

2. See 11 U.S.C.A. §§ 32, sub. c(3) and 35, sub. a(2).

3. See 8 C.J.S., Bankruptcy, § 579.

results in the plaintiff not getting the relief to which it claims to be entitled, whether in the amount or in the quality of the judgment, it has a right to be heard on appeal.

Were then the findings leading to the conclusion that Cunningham's representations were not fraudulent clearly erroneous? Rule 52(a), F.R.C.P.

The financial statement submitted to Aetna showed under the heading of "Surplus and Undivided Profits" a net worth for Cunningham of $109,723.08 as of December 31, 1948, while his books as of that date reflected a net worth of only $64,304.60. His accountant witness, in an effort to reconcile the two figures, included a number of assets of a personal character plus a sum not carried on Cunningham's books, but listed on the statement as "Earned Estimates and Retainage on uncompleted contracts *shown by Engineers' or Architects' Estimates* (as per Schedule 'D') $32,306.00." (Emphasis supplied.) Actually, this $32,306.00 was a mere estimate by Cunningham's superintendent (who was an engineer) of profits earned, and was not shown by the estimate or certificate of any supervising architect or engineer on the job. While the contracts when completed resulted in losses, the superintendent's estimate of profits at the time made was not shown to be unreasonable. The statement of net worth is certainly open to suspicion, but we cannot say as to this item that the findings of the district court were clearly erroneous.

The cash in bank was listed on the financial statement as $3,095.06, and could be reconciled with the cash on hand and in banks only by including a withholding tax deposit in the sum of $1,305.-60, against which no corresponding liability was listed. Again, however, this was a relatively minor item, and might not necessarily indicate fraud.

When we come to the item of "Notes Payable", the amount shown on the statement was $2,500.00, while actually, as

of the same date, Cunningham had outstanding notes of around $223,000.00. Cunningham's accountant witness undertook to explain, as we understand his testimony, that evidently it had not been thought necessary to include in the financial statement notes secured by mortgages in the amount of $38,700.00, an equipment note of $1,275.00, and notes for construction loans for interim financing of jobs in the aggregate sum of $193,100.00. Actually, the mortgage notes of $38,700.00 were shown on the financial statement under "Schedule 'I' —Real Estate". Aetna was in the business of making performance bonds for contractors, and had been signing bonds for Cunningham since 1942. It must have known of the method of interim financing used by contractors for construction jobs testified to by Cunningham's accountant witness as follows:

"A. Well, I think his procedure was to—after a contract had been secured, to secure interim financing through the banks, and that would be on a month-to-month basis, and as he would need finances to meet payrolls and material bills and whatnot, he would draw from the banks on a loan which probably had a limit. Then as the owners on monthly estimates would remit to Mr. Cunningham, of course, the banks would have a lien against that money, and he would then turn around and pay the bank off on that loan and go into another month of operation."

Schedule "J", which would have shown detailed information about the notes payable, was not filled out.[4] We think that with Notes Payable listed at only $2,500.-00, both Aetna and Cunningham must have understood that notes for construction loans for interim financing were not included.

The foregoing were the major items as to which a discrepancy was shown between the financial statement and Cunningham's books. After reading the en-

4. Likewise, "Schedule 'A'—Cash in Bank" and "Schedule 'D'—Earned Estimates and Retainage on Uncompleted Contracts" were left blank.

tire record, and carefully examining the testimony of the two accountant witnesses, we are not prepared to say that the findings of the district court were clearly erroneous.

The judgment is therefore
Affirmed.